**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **SARAH BETH LEWIS,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | No. 11 C 3466 |
| v. ) | |
| ) | Magistrate Michael T. Mason |
| **MICHAEL J. ASTRUE,** ) | |
| **Commissioner of Social Security,** ) | |
| ) | |
| **Defendant.** ) | |

**Memorandum Opinion and Order**

Michael T. Mason, United States Magistrate Judge:

Claimant Sarah Beth Lewis ("Sarah" or "claimant") has a filed motion for summary judgment [17] seeking judicial review of the final decision of the Commissioner of Social Security (the "Commissioner") denying her claim for disability insurance benefits under the Social Security Act, 42 U.S.C. §§ 416(i) and 423(d). The Commissioner has filed a cross-motion for summary judgment [19], in which he asks the Court to uphold the decision of the Administrative Law Judge. This Court has jurisdiction to hear this matter pursuant to 42 U.S.C. § 405(g). For the reasons set forth below, claimant's motion for summary judgment is granted and the Commissioner's motion for summary judgment is denied.

**I.   BACKGROUND**

   **A.   Procedural History**

On March 13, 2008, Sarah filed applications for period of disability and disability insurance benefits ("DIB") alleging a June 5, 2006 onset of disability due to learning

disabilities and hearing loss. (R. 62.) Her date last insured is March 31, 2008. (*Id.*) Sarah's applications were denied initially on May 22, 2008, and upon reconsideration on August 31, 2008. (R. 64-68, 72-75.) Sarah filed a timely request for a hearing on October 24, 2008. (R. 78-79.)

On March 18, 2010, Sarah appeared with counsel before Administrative Law Judge ("ALJ") Peter J. Caras. (R. 29-61.) On April 23, 2010, ALJ Caras issued a written decision denying Sarah's request for benefits. (R. 13-24.) Sarah filed a timely request for review of the ALJ's decision (R. 12), but the Appeals Council denied that request on April 14, 2011. (R. 1-4.) At that time, the ALJ's decision became the final decision of the Commissioner. *Tumminaro v. Astrue*, 671 F.3d 629, 632 (7th Cir. 2011). This action followed.

### B. Medical Evidence

#### 1. Treating Physicians and School Records

##### a. Ottawa Township High School and the LaSalle County Educational Alliance for Special Education

Records reveal that Sarah received a number of special education services during her time at Ottawa Township High School, as well as in elementary school. On November 10, 2001, Sarah, a freshmen at the time, underwent a "Social Development Study" with school social worker Debra R. Turner. (R. 247-49.) Turner reported that Sarah had received learning disability services since 1994. (R. 249.) According to Turner, Sarah presented with weak reading comprehension and math concept skills, difficulties with written expression, and problems remaining attentive and staying organized. (R. 248.) She described Sarah as a "very needy young lady" emotionally

2

and noted that some of Sarah's behaviors were "immature for her age." (R. 248-49.) Turner recommended that someone work with Sarah to "discuss age appropriate behaviors in the school setting." (R. 249.)

Sarah underwent hearing testing at the LaSalle County Educational Alliance for Special Education Audiological Center on December 2, 2003 after failing two hearing screenings with the school nurse. (R. 230-31.) The tests revealed that Sarah had severe, low to high frequency, sensorineural hearing loss in the right ear. (R. 231.) Her "speech discrimination in soundfield was excellent (92%) in quiet and was reduced to fair (76%) with competing noise present." (*Id.*) The audiologist recommended an otologic examination, an audiologic re-evaluation following medical management, and "preferential seating such that speech is oriented toward the better left ear." (*Id.*)

School psychologist Paula Medema evaluated Sarah on December 12, 2003, at which time she was in the eleventh grade. (R. 245-46.) According to the Wechsler Adult Intelligence Scale-III, Sarah's verbal IQ was 85, her performance IQ was 76, and her full scale IQ was 79. (R. 246.) The Woodcock-Johnson Psychoeducational Battery revealed that Sarah's reading recognition skills were at a beginning fourth grade level, her comprehension skills were at the high fifth grade level, her math calculation skills were at the high fourth grade level, and her spelling skills were at the mid-fourth grade level. (*Id.*) According to Medema, Sarah's overall ability fell within the borderline range. (*Id.*) Medema did note that this might be a low estimate of Sarah's abilities because she entered the evaluation "somewhat hesitantly" and "full effort may not have been given when she was becoming frustrated." (R. 245-46.)

The record also includes two of Sarah's Individualized Education Plan ("IEP")

Reports. The IEP Report dated March 4, 2004 includes comments on Sarah's recent hearing loss, her weak reading comprehension, abstract reasoning and organizational skills, and her tendency to become easily overwhelmed. (R. 232-44.) The IEP indicates that Sarah continues to benefit from "a program that can provide modified/adapted curriculum and instructions, services to help improve strategies to increase vocabulary and comprehension skills, and services to assist with distractibility and organizational skills and slow processing skills." (R. 236.) It was recommended that Sarah receive supplemental classroom notes from other students and that her seating assignment accommodate her hearing loss. (R. 239.)

The IEP Report from May 4, 2005 reveals that Sarah was on track to graduate high school and intended to attend "IVCC" (presumably Illinois Valley Community College) to study "interpreting for hearing impaired." (R. 222-29.) Post-secondary learning disability support was recommended upon graduation. (R. 228.)

On March 16, 2010, Dr. Karen J. Hoffman, Director of Special Needs at Ottawa Township High School, submitted a letter to the ALJ in support of Sarah's disability applications. (R. 186.) Dr. Hoffman reported that Sarah's school record reveals that she received special needs support services throughout high school for "significant deficits in the areas of visual abstract reasoning skills, weak organizational skills, distractibility, listening comprehension, reading comprehension, written expression, math calculations and math reasoning skills." (*Id.*) She further stated that Sarah's processing speed fell in the mild cognitive disability range, which "makes it extremely difficult for Sarah to grasp and retain new or difficult material." (*Id.*) Dr. Hoffman also explained that after high school, Sarah worked as a substitute teaching assistant, but

4

was let go due to her level of performance. (*Id.*) In Dr. Hoffman's opinion, Sarah "will have extreme difficulty in finding and maintaining competitive employment." (*Id.*)

### b. Ottawa Medical Center

On March 11, 2005, Sarah saw Dr. Brian Rosborough at the Ottawa Medical Center for "an examination for possible limited guardianship." (R. 192, 194.) In describing the history of Sarah's "present illness," Dr. Rosborough noted that she had "cognitive dysfunction with low average intelligence, not meeting the criteria for mental retardation." (R. 194.) Dr. Rosborough further noted that Sarah did not have a history of ADHD or depression, nor prior child psychiatric involvement or counseling. (*Id.*) Sarah's mother explained to Dr. Rosborough that she was concerned about guardianship because Sarah could not make decisions on her own or get a job handling money. (*Id.*) Dr. Rosborough also noted complaints of anxiety, low self esteem, and weak organizational skills. (*Id.*)

Dr. Rosborough's physical examination revealed unremarkable results. (R. 192.) He assessed a "mild cognitive impairment" and completed the medical report for the petition for appointment of guardianship. (*Id.*) He noted that the intent was for Sarah to live with her parents and continue basic education, with the goal of finding a suitable job and living situation. (*Id.*) On May 11, 2005, the Circuit Court of the Thirteenth Judicial Circuit of Illinois entered an order adjudicating Sarah disabled and appointed her parents her legal guardians. (R. 122-23.)

### c. Dr. Amar Dave

On May 3, 2008, Dr. Amar Dave sent a letter to the Illinois Department of Human Services in support of Sarah's application for benefits. (R. 250.) Dr. Dave reported that

5

he had reviewed Sarah's school records and examined her on May 2, 2008. (*Id.*) According to Dr. Dave, Sarah has a "significant cognitive deficit performing at 4-5 years of age." (*Id.*) He commented on the loss of hearing in Sarah's right ear, but noted there was no definitive determination as to the cause of that hearing loss. (*Id.*) Dr. Dave stated that Sarah's parents "take care of her life in every aspect." (*Id.*) Although Dr. Dave is described in the record as having treated Sarah on and off for her entire life, (R. 135), none of Dr. Dave's treatment records were a part of the record before the ALJ.[1]

### 2. State Agency Consultants

On April 21, 2008, Dr. Joseph Mehr completed a psychiatric review technique for Sarah. (R. 201-14.) Dr. Mehr found that Sarah suffered from a organic mental disorder, specifically "borderline to low normal intellectual function." (R. 202.) He concluded that Sarah had mild restrictions of activities of daily living, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, and pace. (R. 211.)

On the same day, Dr. Mehr also completed a mental residual functional capacity ("RFC") assessment. (R. 215-17.) Dr. Mehr found moderate limitations in two categories: (1) the ability to understand and remember detailed instructions, and (2) the ability to carry out detailed instructions. (R. 215.) In all other categories, Dr. Mehr

---

[1] Dr. Dave also completed a mental residual capacity assessment on July 5, 2010, in which he reported that Sarah has marked limitations in eighteen of the twenty listed categories, which relate to understanding and memory, sustained concentration and persistence, social interaction, and adaptation. (R. 269-71.) According to Dr. Dave, Sarah requires constant supervision in all aspects of daily living, including any employment position. (R. 271.) This report was not accompanied by any treatment records. More importantly, this assessment was submitted to the Appeals Council following the ALJ's decision, and as a result, "cannot now be used as a basis for finding reversible error." *Rice v. Barnhart*, 384 F.3d 363, 366 n.2 (7th Cir. 2004).

6

found that Sarah was not significantly limited. (R. 215-16.) More specifically, he concluded that Sarah retained the capacity to, among other things, remember instructions for simple actions of a routine and repetitive type, and retained sufficient attention and concentration to persist at and complete such activities for periods greater than several hours. (R. 217.) He also found that Sarah retained the capacity to maintain a regular schedule and punctual attendance without special supervision, and could complete a normal workday and week, performing at a regular acceptable pace with only typical breaks. (*Id.*) He further noted that she retained the capacity for generally socially appropriate behavior. (*Id.*)

Sarah underwent a consultative otological examination with Dr. Dino Delicata at The Hearing Center in Downers Grove on May 7, 2008. (R. 251-56.) Sarah complained of sudden hearing loss in 2003 in her right ear, but said that she retained normal hearing in her left ear. (R. 251.) Dr. Delicata noted that Sarah relies on her left ear for communication and that her speech was "clear and easily understood." (*Id.*) Audiological tests revealed profound sensorineural hearing loss in Sarah's right ear, and mild sensorineural hearing loss in her left ear. (*Id.*) Neither speech testing nor aided testing could be performed on the right ear due to the severity of her hearing loss. (*Id.*) Dr. Delicta recommended continued otological care, evaluation and trial of a CROS hearing aid or BAHA evaluation, and annual audiograms.[2] (*Id.*)

On May 16, 2008, Dr. Calixto Aquino performed a physical RFC assessment. (R.

---

[2] Both the CROS (contralateral routing of signals) hearing aid and the BAHA (bone anchored hearing aid) are used to treat unilateral hearing loss. *See* University of Maryland Medical Center, Center for Auditory Solutions, http://www.umm.edu/otolaryngology/baha.htm (last visited May 10, 2012).

7

257-64.) Dr. Aquino found no physical limitations apart from Sarah's limited ability to hear as a result of her profound sensorineural hearing loss in the right ear. (R. 261.) He concluded that Sarah should avoid concentrated exposure to noise and hazards, such as machinery and heights. (*Id.*) These findings were reviewed and confirmed by Dr. Michael Nenaber and Dr. Phyllis Brister on August 20, 2008. (R. 265-67.)

**C.     Hearing Testimony**

**1.     Cindy Lewis**

Sarah's mother, Cindy Lewis ("Mrs. Lewis"), appeared at the hearing and testified as follows. Mrs. Lewis testified that Sarah had a history of receiving special education services, starting in the first grade and continuing through high school. (R. 32.) Mrs. Lewis explained that Sarah was held back in kindergarten, and then placed in a "self contained" classroom through elementary school and junior high school. (R. 47-48.) However, this curriculum ended when Sarah enrolled at Ottawa Township High School and merged with the general population. (R. 48.) In high school, Sarah received a number of special services, including a study skills teacher, a test reader, and extra time for tests. (R. 49.) Mrs. Lewis testified that Sarah participated in choir and Sign Club at Ottawa Township. (R. 45.)

Upon graduating from high school, Sarah was employed at Kroger grocery store as a part-time utility clerk from August 2005 to June 2006. (R. 32-33.) Mrs. Lewis testified that Sarah did not enjoy working at Kroger because she found the job very difficult. (R. 33-34.) Mrs. Lewis explained that Sarah would tell her that she was often

8

yelled at for not working fast enough or for struggling with directions.[3] (R. 34-35.) In addition to her work at Kroger, Mrs. Lewis testified that Sarah worked briefly as a substitute teacher's aide at Ottawa Township, but was let go because "it didn't go well." (R. 43.)

Sarah has had other part-time positions, including working as a babysitter for one of Mrs. Lewis' friends. (R. 36.) Mrs. Lewis testified that the child would be dropped off at the Lewis' home in the morning, and Sarah was responsible for watching the child until the afternoon, when the mother returned. (*Id.*) However, Mrs. Lewis further testified that she was always present to supervise and that Sarah was never left alone with the child. (*Id.*) In addition to babysitting, Mrs. Lewis testified that Sarah is responsible for letting out a neighbor's dog every day. (R. 36-37.) But Mrs. Lewis keeps close tabs on Sarah when she goes to the neighbor's house. (R. 37.)

Mrs. Lewis further testified as to Sarah's mental capacity, stating that she does not have the maturity of a twenty-four year old, but instead identifies with family members that are ten or eleven years old. (R. 39.) Sarah has interests that would appeal to younger children, such as dolls and illustrated cartoon books. (R. 39-40, 44.) Mrs. Lewis testified that Sarah spends a lot of time in her room watching television and playing on the computer. (R. 44.) Sarah does have some friends and Mrs. Lewis tries to encourage her to spend more time with them. (R. 43.)

Mrs. Lewis further testified that Sarah needs to be supervised in every aspect of

---

[3] The record also includes a letter from Leeann Welsh, the store manager at Kroger. (R. 187.) Ms. Welsh reported that despite Sarah's best efforts, she "struggled to keep up with the demands of the job" and "needed constant supervision throughout her shifts." (*Id.*)

her life, that she is unable to handle or count money, and that she will probably never live on her own. (R. 41.) Sarah is unable to drive because the multitasking aspects of driving are too difficult for her to manage. (R. 38-39.)

Mrs. Lewis explained that she had ceased her efforts to find Sarah work, as it became too difficult. (R. 42.) Mrs. Lewis did approach an organization called Friendship Village for job placement assistance, but was informed that they do not provide services for people with Sarah's functional and intellectual capacity, which was a little higher than those they typically served. (R. 43.)

When asked about Sarah's hearing problems, Mrs. Lewis explained that Sarah had sudden hearing loss in one ear and constantly complains that her ears hurt. (R. 41.) According to Mrs. Lewis, Sarah's doctors have not found an explanation for her hearing loss and have simply advised Sarah to take Tylenol for the pain. (R. 41-42, 46.) Mrs. Lewis also explained that Sarah gets frustrated in noisy settings and has a difficult time coping in such settings. (R. 42.)

### 2. Claimant

Sarah also testified briefly at the hearing. Sarah first testified that the hearing loss in her right ear makes it difficult to understand people when she is in a crowded room. (R. 51.) She also testified that her hearing loss affected her ability to work at Kroger, particularly due to the noise from the conveyor belts or moving shopping carts. (R. 51-52.) Sarah did not like to work at Kroger because she was often yelled at for not being able to understand instructions over the noise or complete the tasks she was asked to perform. (R. 52.)

When asked what she likes to do for fun, Sarah responded that she enjoys

reading, listening to music, playing video games, and playing with her dolls, her niece and her pets. (*Id.*) She also enjoys watching animated television shows. (R. 52-53.)

### 3. John Lewis

Sarah's father, John Lewis ("Mr. Lewis") also provided testimony at the hearing. Mr. and Mrs. Lewis run a plumbing supply business from their home. (R. 54.) Mr. Lewis testified that Sarah has difficulty taking phone messages from his customers because she forgets to take down the pertinent information such as the customer's name, address, and phone number. (R . 55.) She also forgets to inform him about the calls. (*Id.*) Additionally, Mr. Lewis testified that Sarah treats her sister's dog "like a baby" and talks to the dog as if it were human. (R. 56-57.)

### 4. Vocational Expert's Testimony

Vocational Expert ("VE") Ronald Malik also appeared at the administrative hearing. The ALJ first asked VE Malik to consider the following hypothetical individual:

> Let's assume a hypothetical claimant, younger individual, high school diploma, Special Ed. We're looking at nonexertional limitations here. Not requiring acute bilateral hearing. Mentally, we're looking at, of course, unskilled work, no strict quotas, not fast paced as in assembly but rather where the emphasis is on completing the work in an eight-hour work shift rather than an hourly production basis, not regard[ed] as very stressful and occasional interaction with people, not requiring significant memorization which I assume would be consistent with these limitations anyway.

(R. 58.) The ALJ stated that the VE should ignore past work, and then asked what jobs, if any, such an individual could perform. (*Id.*)

VE Malik responded with a number of positions performed at the light exertional level, including housekeeper, bench assembler, production assembler, assembler press operator, and dye press operator. (R. 58-59.) VE Malik explained that the

aforementioned jobs (other than light housekeeping) require the individual to work alone and assemble products in a simple, one or two-step procedure. (R. 58-59.)

Claimant's counsel then asked whether adding constant supervision to the ALJ's hypothetical would eliminate all jobs. (R. 60.) The VE responded in the affirmative. (*Id.*)

## II. LEGAL ANALYSIS

### A. Standard of Review

This court will affirm the ALJ's decision if it is supported by substantial evidence and free from legal error. 42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). Substantial evidence is more than a scintilla of evidence; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995) (*quoting Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)). We must consider the entire administrative record, but will not "re-weigh evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner." *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003) (*citing Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000)). This Court will conduct a critical review, and will not let the ALJ's decision stand if it lacks evidentiary support or adequate discussion. *Lopez*, 336 F.3d at 539 (*quoting Steele*, 290 F.3d at 940).

While the ALJ "is not required to address every piece of evidence," he must "build an accurate and logical bridge from the evidence to his conclusion." *Clifford*, 227 F.3d at 872. The ALJ must "sufficiently articulate his assessment of the evidence to

assure us that the ALJ considered the important evidence ... [and to enable] us to trace the path of the ALJ's reasoning." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (per curiam) (*quoting Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985)).

>    **B.** **Analysis Under the Social Security Act**

In order to qualify for DIB, a claimant must be "disabled" under the definition of the Social Security Act (the "Act"). A person is disabled under the Act if he or she has "an inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). In making this determination, the ALJ is required to apply the following five-step inquiry: "(1) whether the claimant is currently employed, (2) whether the claimant has a severe impairment, (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling, (4) if the claimant does not have a conclusively disabling impairment, whether he can perform past relevant work, and (5) whether the claimant is capable of performing any work in the national economy." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). The claimant has the burden of establishing a disability at steps one through four. *Zurawski v. Halter*, 245 F.3d 881, 885-86 (7th Cir. 2001). If the claimant is successful in reaching step five, the burden then shifts to the Commissioner to demonstrate that the claimant is "capable of performing work in the national economy." *Id.* at 886.

Here, ALJ Caras followed this five-step inquiry in reaching his decision to deny Sarah's request for benefits. At step one, the ALJ found that Sarah was not engaged in substantial gainful activity during the period from her alleged onset through her date last

13

insured. (R. 18.) At step two, the ALJ found that Sarah had the following severe impairments: "borderline intellectual functioning, learning disability, hearing loss." (*Id.*) At step three, ALJ Caras determined that Sarah did not have an "impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." (R. 18-20.)

Next, the ALJ determined that Sarah possessed the RFC to perform a full range of work at all exertional levels, but had certain non-exertional limitations. (R. 20.) Specifically, the ALJ found that Sarah should be limited to low-stress, unskilled work consisting of one to two step operations, that was not fast-paced and that did not require acute bilateral hearing. (R. 20.) The ALJ further limited Sarah to work "involving no strict quotas, and work where the emphasis was on completing the work in eight hour shifts rather than an hourly production basis." (*Id.*) The work must not involve significant memorization and should require only occasional contact with other people. (*Id.*)

At step four, the ALJ found that Sarah's "reduced residual functional capacity precluded the performance of any past relevant work." (R. 23.) Finally, at step five, the ALJ found that "considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that claimant could have performed," including housekeeper, bench assembler, and production assembler. (R. 23-24.) As a result, the ALJ entered a finding of not disabled. (R. 24.)

Sarah now takes issue with the ALJ's decision to afford the opinion of Dr. Karen Hoffman little weight, his credibility determination, his hypothetical to the VE, and his

14

reliance on the VE's testimony.

### C. The ALJ Did Not Err When He Afforded Dr. Hoffman's Opinion Little Weight.

According to Sarah, ALJ Caras committed reversible error by discounting the opinion of Dr. Hoffman, who she considers a treating physician. As discussed above, Dr. Hoffman was the Director of Special Needs at Ottawa Township. She submitted a letter verifying Sarah's history of special education services, commenting on some of Sarah's limitations, and indicating that, in her opinion, Sarah would "have extreme difficulty in finding and maintaining competitive employment." (R. 186.) In discrediting Dr. Hoffman's opinion, the ALJ stated that "there is no treatment record with this individual, and no evidence of testing or other clinical measures of performance that could support [Dr. Hoffman's] conclusions." (R. 22.)

Claimant is correct that the opinion of a treating physician is generally entitled to controlling weight if it is consistent with the record. 20 C.F.R. § 404.1527(c)(2); *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011). As defined in the regulations, a "treating physician" is a physician "who provides [the claimant] or has provided [the claimant], with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]." 20 C.F.R. § 404.1502.

Here, as the Commissioner correctly argues, the record does not support a finding that Dr. Hoffman qualifies as a treating physician under the regulations. Apart from her letter, the only other reference to Dr. Hoffman comes in the March 3, 2004 IEP report, which simply includes her signature indicating that she participated in the evaluation. Although claimant argues that Dr. Hoffman was very involved during

15

Sarah's time at Ottawa Township and participated in "every IEP evaluation," the only other IEP report in the record does not include her signature on the "participants" page. (*See* R. 229.) Because the record simply does not support a treating relationship between Sarah and Dr. Hoffman, her opinion was not entitled to the benefit of the treating physician rule. *See White v. Barnhart,* 415 F.3d 654, 658 (7th Cir. 2005) (affirming the ALJ's decision not to afford a physician's opinion controlling weight where he did not qualify as a treating physician under the regulations); *Ramos v. Astrue*, No. 09 C 5727, 2012 WL 254245, at *8 (N.D. Ill. Jan. 27, 2012) (same).

Further, even if Dr. Hoffman could be considered a treating physician, she failed to submit any treatment records or evaluations to support her opinion. *See* SSR 96-2p, 1996 WL 374188, at *1 ("Controlling weight may not be given to a treating source's medical opinion unless the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques."). As such, we find no error in the ALJ's decision to afford Dr. Hoffman's opinion little weight.

### D. The ALJ's Credibility Assessment Was Deficient.

Sarah also argues that the ALJ erred in his assessment of her credibility. Although some of Sarah's arguments on this issue are unavailing and warrant no comment (*i.e.* that the ALJ failed to consider the lifestyle of a typical teenager), we do agree that the ALJ's credibility determination was otherwise deficient.

It is well settled that the ALJ is in a far superior position to assess the credibility of a witness and, as such, a court will not reverse a credibility finding unless it is "patently wrong," that is unreasonable or unsupported. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000); *Getch v. Astrue*, 539 F.3d 473, 483 (7th Cir. 2008). "The ALJ must

16

explain her decision in such a way that allows us to determine whether she reached her decision in a rational manner, logically based on her specific findings and the evidence in the record." *McKinzey v. Astrue*, 641 F.3d 884, 890 (7th Cir. 2011).

Pursuant to SSR 96-7p, the ALJ must also consider (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the claimant's pain or other symptoms; (3) factors that precipitate and aggravate those symptoms; (4) the type, dosage, effectiveness, and side effects of any medication that the claimant takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the claimant receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the claimant uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms. 1996 WL 374186, at *3.

Here, the ALJ began with the unhelpful boilerplate assertion that the claimant's impairments could reasonably be expected to cause the alleged symptoms, but that "the claimant's and witness statements concerning the intensity, persistence and limited effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." *See Shauger v. Astrue*, 675 F.3d 690, 696 (7th Cir. 2012) ("Credibility findings must have support in the record, and hackneyed language seen universally in ALJ decisions adds nothing."). Apart from the boilerplate language, ALJ Caras provided little more in the way of meaningful analysis regarding his adverse credibility finding, and what he did provide lacks support in the record.

First, in discrediting Sarah's allegations related to her hearing loss, the ALJ

stated that "she was able to hear and understand normal conversation tone during the hearing, and did not need any questions repeated or asked in a louder tone." (R. 21.) The ALJ was certainly in the best position to observe Sarah's abilities at the hearing, but his observation here does little to actually discredit Sarah's testimony or that of her mother. Neither Sarah nor her mother testified that Sarah had difficulty hearing in quiet settings. Instead, Sarah testified that she cannot understand people when she is in a crowded room and had problems working at Kroger because she could not hear over the conveyor belts and shopping carts. (R. 51-52.) Her mother also testified that Sarah is easily frustrated in noisy settings.[4] (R. 42.) Thus, that Sarah could hear in a presumably quiet setting such as an administrative hearing room does not support the ALJ's adverse credibility determination.

The ALJ also concluded that claimant's daily activities, namely babysitting "without assistance," taking care of household pets, cooking and doing chores, "indicate that her functioning is considerably greater than she alleges." (R. 21-22.) While SSR 96-7p indeed requires the ALJ to consider the claimant's daily activities, the ALJ must also consider *how* those activities are performed. *See Craft v. Astrue*, 539 F.3d 668, 680 (7th Cir. 2008). Unfortunately, ALJ Caras failed to develop a clear record on the issue of how Sarah performed her activities. In a telephone conference on April 10, 2008, Mrs. Lewis reported that Sarah could babysit "without assistance." (R. 162.) But then, at the hearing before the ALJ, Mrs. Lewis testified adamantly that she is always

---

[4] We note that the medical records are consistent with this testimony in that Dr. Kirkpatrick found Sarah's speech discrimination abilities "excellent" in quiet settings, but only "fair" with competing noise present. (R. 231.)

18

present when Sarah babysits and that Sarah essentially needs constant supervision in every aspect of her life. In our view, before relying solely on the telephone report to discredit Sarah's purported limitations, the ALJ should have questioned Mrs. Lewis about the clear discrepancy in the record. As claimant points out, the ALJ could have also elicited testimony from Sarah or Mr. Lewis as to whether Mrs. Lewis is present in the home when Sarah babysits.[5]

At the very least, because Mrs. Lewis provided the most comprehensive testimony regarding Sarah's purported limitations, the ALJ should have provided an explicit explanation as to which portions of her testimony he found credible, which portions he did not, and why. On this record, simply reciting portions of Mrs. Lewis' testimony was insufficient. *See Giles ex rel. Giles v. Astrue*, 483 F.3d 483, 488-88 (7th Cir. 2007).

Given these errors, we are left with the ALJ's determination that Sarah's allegations are incredible because they are not supported by medical evidence or laboratory findings. However, it is well settled that such a finding, on its own, cannot suffice to support an adverse credibility finding. *See Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009) (noting that the "ALJ may not discredit a claimant's testimony about her pain and limitations solely because there is no objective medical evidence supporting it."). As a result, we find that the ALJ failed to build an accurate and logical bridge from the evidence to his credibility determination, and remand is required.

---

[5] The issue of constant supervision during daily activities is particularly relevant here given the VE's testimony that all jobs would be eliminated if the need for constant supervision was added to the ALJ's hypothetical.

19

In light of our decision to remand, we do not address claimant's remaining arguments regarding the ALJ's hypothetical to the VE and the VE's testimony. We note, however, that all but one of the available positions suggested by the VE, and in turn cited by the ALJ, are in factory and production settings. This flies in the face of the finding of the agency's own reviewing physician, Dr. Aquino, that Sarah must avoid concentrated exposure to noise and hazards, such as machinery. The ALJ did not address Dr. Aquino's finding. He should take care to do so on remand.

### III. CONCLUSION

For the reasons set forth above, claimant's motion for summary judgment is granted and the Commissioner's motion for summary judgment is denied. This case is remanded to the Social Security Administration for further proceedings consistent with this Opinion. It is so ordered.

**ENTERED:**

_[signature: Michael T. Mason]_

**MICHAEL T. MASON**
**United States Magistrate Judge**

**Dated: May 18, 2012**